UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

WILL POULTRY, INC.,

                              Plaintiff,

          v.                                    DECISION AND ORDER
                                                   13-CV-1135

TEAMSTERS LOCAL 264, an affiliate
of the International Brotherhood of
Teamsters,

                              Defendant.

═══════════════════════════════

## INTRODUCTION

          Before the Court is plaintiff Will Poultry Inc.'s ("Will Poultry" or "plaintiff")

motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of

Civil Procedure.  As explained in detail below, Will Poultry's motion for a

preliminary injunction is granted.

## SUMMARY OF FACTS AND PRIOR PROCEEDINGS

          Will Poultry is the largest locally-owned, full-time beef, pork, poultry,

seafood, kosher and international food distributor in Western New York.[1]

Approximately 60 employees of Will Poultry are represented by defendant

─────────────────────

          [1]  The relevant facts have been gathered from affidavits and memorandums
submitted by plaintiff and defendant.

Teamsters Local 264 ("Local 264" or the "union").  Local 264 and Will Poultry are

parties to a collective bargaining agreement effective March 2012 through March

2015.

Donald Will, the owner of Will Poultry, is 86 years old and seeks to sell the

company.  However, he wants the company to remain in Western New York.

Plaintiff states that Mr. Will has searched for approximately three years to find a

buyer who intends to keep the company in Buffalo and retain some, if not all, of

its current employees.  On September 13, 2013, Will Poultry entered into an

Asset Purchase and Sale Agreement ("APA") with a potential buyer.  Plaintiff

maintains that it chose this buyer, in part, because it intends to keep the company

local and retain some of the current employees.

The APA requires Will Poultry to terminate the employment of all

employees prior to closing, and gives the purchaser the discretion to offer

employment to any or all of Will Poultry's employees.  Further, the APA does not

require the purchaser to recognize Local 264 or assume the CBA.  The APA

contains the following language:

> Seller shall, effective immediately prior to Closing, terminate the
> employment of all employees at the Premises.  Buyer may offer
> employment to those Affected Employees as appropriately
> determined by Buyer, for compensation and benefits on such terms
> as determined by Buyer.  Seller represents that it has no agreement,
> whether oral or written and/or whether contained in a collective
> bargaining agreement ("CBA") or otherwise, with any collective
> bargaining representative ("Union") representing any portion of its
> Affected Employees, that purports to impose a successorship

2

obligation on Buyer....Buyer shall not be bound by any such CBA and/or other agreement.

On September 25, 2013, Will Poultry sent notices to all employees pursuant to the New York State Worker Adjustment and Retraining Notification Act as well as the federal Worker Adjustment and Retraining Notification Act ("WARN notices").  The WARN notices advised employees that their employment would be terminated effective December 28, 2013.  The WARN notices also stated that it was the company's understanding that the buyer would make offers of employment to some or all of Will Poultry's employees at or around the time the transaction closed.

On October 2, 2013, Local 264 filed a grievance stating that the layoffs described in the WARN notices violated Section 8 of the CBA.  Section 8.3 of the CBA states, in relevant part, that "the Employer shall have the right to discharge any employee for drunkenness, dishonesty, and/or just cause and shall have the right to lay off employees as may be necessary because of conditions."  Local 264 also demanded that Will Poultry meet and engage in effects bargaining regarding the asset sale and the layoffs.  On October 17, 2013, the parties and their attorneys met for an initial bargaining session.  At that time, Local 264 demanded that Will Poultry modify the CBA to include a "Successor and Assigns" provision which would require the buyer to: (1) assume the CBA; (2) recognize Local 264; and (3) retain all bargaining unit employees.  Will Poultry contends

that, at this time, Local 264 informed the company that it had unanimously voted to strike if the company did not add the requested language to the parties' CBA.

Counsel for Will Poultry sent a letter, dated October 23, 2013, to counsel for Local 264 stating that the grievance and arbitration procedure in the CBA prohibited the union from striking over their demand to modify the contract to include a Successor and Assigns Clause.  In a series of correspondence that followed, the company continued to request that Local 264 withdraw its strike demand and instead comply with the grievance and arbitration procedure set forth in the parties' CBA.  On November 8, 2013, Mr. Will received a letter, which had been sent to a customer of Will Poultry, indicating that Local 264 intended to strike against Will Poultry on November 18, 2013 and to engage in leafleting at the customer's property.

On November 14, 2013, Will Poultry filed a lawsuit against Local 264 in New York State Supreme Court, Erie County, alleging, *inter alia*, breach of the CBA due to Local 264's refusal to abide by the grievance and arbitration procedure as well as tortious interference with business relations between Will Poultry and its customers.  Will Poultry also moved for a temporary restraining order and injunction prohibiting Local 264 from striking and/or engaging in secondary activity.  That same day, the Hon. Timothy J. Walker, J.S.C., granted Will Poultry's order to show cause and request for a temporary restraining order in anticipation of a hearing.

Prior to the state court hearing, Local 264 removed this case to the Western District of New York.  (Dkt. No. 1)  Will Poultry then renewed its request for a preliminary injunction.  (Dkt. No. 7)[2]  Will Poultry argues that it is entitled to an order, pending arbitration of the underlying dispute or termination of Local 264's no-strike obligation: (1) requiring Local 264 to comply with the grievance and arbitration procedures of the CBA; and (2) enjoining Local 264 from engaging in striking, picketing or any type of work stoppage, as well as picketing of Will Poultry's customers.

The parties appeared before this Court for a status conference on December 5, 2013.  At that time, the parties agreed that the Court is first required to make a preliminary determination as to whether it has subject matter jurisdiction to enjoin striking and picketing by Local 264 pursuant to the terms of the parties' CBA and the *Boys Market* exception to the *Norris-LaGuardia* Act. The parties further agreed that Local 264 would not engage in any strike or secondary activity, with the exception of peaceful leafleting, until the Court had an opportunity to receive briefing and hear oral argument as to this issue.

After reviewing additional briefing (Dkt. Nos. 13 and 14) and hearing oral argument on December 10, 2013, the Court issued a Decision and Order setting

---

[2]  Will Poultry has also filed an amended complaint, which alleges that Local 264 violated Section 301(a) of the Labor Management Relations Act by refusing to comply with the CBA's mandatory grievance and arbitration procedure.  (Dkt. No. 12)  The amended complaint does not contain any tortious interference claims.

forth its preliminary finding that it had subject matter jurisdiction to enter an injunction in the dispute.  (Dkt. No. 16)  The Court also found that Will Poultry was entitled to a temporary restraining order because it demonstrated a likelihood of success on the merits and made a preliminary showing of irreparable harm. *Id*.[3]  The Court then permitted each side an opportunity to submit additional briefing, including affidavits, addressing irreparable harm, the balance of equities and any other relevant arguments regarding the likelihood of success on the merits.  *Id*.

The parties filed additional submissions on December 16, 2013.  (Dkt. Nos. 17, 18 and 19) and oral argument was held on December 19, 2013.  For the reasons now discussed, the Court finds that Will Poultry is entitled to a preliminary injunction.

## DISCUSSION

Early in the twentieth century, injunctions were frequently used by management in order to defeat organizational attempts by labor unions.  *Local 1814, International Longshoreman's Association, AFL-CIO v. New York Shipping Association, Inc.*, 965 F.2d 1224 (2d Cir. 1992).  Then, in 1932, Congress passed

---

[3]  In the December 10, 2013 Decision and Order, this Court ordered that the November 14, 2013 Temporary Restraining Order signed by Judge Walker was to remain in full force and effect and that Local 264 was temporarily restrained from striking, and/or picketing at Will Poultry's customers, and/or further interfering with Will Poultry's business relationships through and including December 19, 2013, unless further extended by the Court.

the *Norris-LaGuardia* Act, in part, to "correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on behalf of management."  *Id*.; *accord Boys Market, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 250 (1970).  To that end, Section 4 of the *Norris-LaGuardia* Act provides, in relevant part, that "[n]o court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute."  29 U.S.C. §104.

Despite these general principles, the Supreme Court, in recognition of the federal policy favoring arbitration of labor issues, has carved out an exception to the statutory rule prohibiting federal courts from granting injunctions in labor disputes.  *Boys Market Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970); *accord  Elevator Manufacturers' Association of New York, Inc. v. Local 1, International Union of Elevator Constructors*, 689 F.2d 382 (2d Cir. 1982).  This exception provides that a labor strike may be enjoined "when it arises out of a grievance that is the subject of compulsory arbitration, provided the usual equitable requirements for a preliminary injunction are met."  *Elevator Manufacturers' Assoc.*, 689 F.2d at 385; *New York Telephone Co. v. Communications Workers of America*, 445 F.2d 39, 50 (2d. Cir. 1971) (in order to enjoin a labor dispute, the court must find that both parties are required to arbitrate the dispute and the employer should be so ordered as a condition to relief).

7

In *Boys Market, Inc.*, the Supreme Court set forth the specific circumstances in which a district court could enjoin a labor strike. 380 U.S. at 249-55. Those circumstances include the following: (1) the collective bargaining agreement contains a mandatory grievance procedure; (2) the agreement contains a no-strike clause; (3) the underlying dispute or disputes involved are subject to the mandatory grievance procedure; and (4) the traditional requirements of equity–irreparable harm and balance of hardships–are satisfied. *Id.*; *Otis Elevator Company v. Local 1, International Union of Elevator Constructors*, 684 F. Supp. 80 (SDNY 1988). The Court finds that these circumstances are satisfied here.

### *The CBA Contains a Mandatory Grievance and Arbitration Procedure and an Implied No-Strike Clause*.

There is no express no-strike clause in the CBA between Will Poultry and Local 264. However, "injunctive relief may also be granted on the basis of an implied undertaking not to strike." *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368 (1973). In *Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95 (1962), the Supreme Court held that a contractual commitment to submit grievances to final and binding arbitration gives rise to an implied obligation not to strike over such disputes. *See* 369 U.S. 95 (1962). In fact, in *Boys Market*, the Supreme Court opined the following:

> A no-strike obligation, express or implied, is the *quid pro quo* for an
> undertaking by the employer to submit grievance disputes to the

process of arbitration...[a]ny incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated.

398 U.S. at 247; *see also Lucas Flour, Co.*, 369 U.S. at 105 ("a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement").

Article 9 of the parties' CBA provides that "all grievances, controversies and disputes under this Agreement (including disputed interpretations of this Agreement) which cannot be otherwise satisfactorily adjusted, shall be resolved [through a grievance and arbitration procedure]."  Article 9 of the CBA also specifically provides that "the decision of the Arbitrator shall be final and binding on the Union, the Company, and the associates in the bargaining unit."  In accordance with the Supreme Court's findings in *Gateway Coal* and *Lucas Flour*, Article 9 of Will Poultry and Local 264's CBA constitutes an implied no-strike clause with respect to any disputes subject to the parties' mandatory grievance and arbitration procedure.  Thus, the Court finds that the first and second requirements enumerated by the Supreme Court in *Boys Market* are satisfied here.

<u>*The Underlying Dispute or Disputes are Subject to the Mandatory Grievance Procedure Set Forth in Article 9*</u>.

In evaluating whether an injunction was appropriate under the principles of

*Boys Market*, the Supreme Court has characterized the underlying dispute as "the event or condition that triggers the work stoppage."  *Jacksonville Bulk Terminals, Inc. v. International Longshoreman's Association*, 457 U.S. 702, 711 (1982). Here, the parties disagree as to the nature of the underlying dispute.  However, the two events which arguably resulted in the threatened strike or work stoppage are: (1) the WARN notices issued by Will Poultry informing the employees that they would be laid-off effective December 28, 2013; and (2) Local 264's demand that, prior to the sale, Local 264 modify the CBA to include a Successor and Assigns Clause requiring the buyer to assume the CBA, recognize Local 264 and retain all bargaining unit employees.  For the following reasons, the Court finds that both of these disputes are subject to the mandatary grievance and arbitration procedure set forth in Article 9 of the parties' CBA.

On October 2, 2013, Local 264 filed a grievance regarding the WARN notices.  The grievance described the "Circumstances of the Dispute" as follows: "[l]etters sent the employees indicating that a layoff will occur as a result of a putative sale of the business.  Violation of Article 8, Section 8.3."  Article 8.3 of the CBA states that "[t]he [e]mployer has the right to...lay off employees as may be necessary because of conditions."  As previously explained, Article 9 of the parties' CBA provides that all grievances and disputes arising out of the CBA shall be resolved through a mandatory grievance and arbitration procedure. Since Local 264 filed a grievance over the layoffs described in the WARN notices,

and referenced a specific clause of the parties' CBA which it alleges to have been violated, it is clear that this dispute is arbitrable and subject to the mandatory grievance and arbitration procedure set forth in the CBA.

Local 264 argues vehemently that the underlying dispute is not the layoff grievance but rather the parties' inability to come to an agreement regarding a Successors and Assigns Clause. The union claims that the dispute over the modification of the CBA to include a Successor and Assigns Clause is a non-arbitrable dispute and therefore cannot support a *Boys Market* injunction. The Court disagrees.

The question of arbitrability "is undeniably an issue for judicial determination." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986). Article 11 of the CBA between the parties sets forth the procedures for terminating *or negotiating changes* to the CBA. Section 11.2 provides:

> Either party desiring to terminate this Agreement *or to negotiate changes in this Agreement* shall give notice to the other party in writing at least sixty (60) days prior to March 8, 2014...[i]f such notice is not given, the Agreement shall be automatically renewed without changes for a period of one (1) year. In the event either party serves such notice of desire to negotiate changes in this Agreement, it is mutually agreed that the Employer and Union without undue delay shall begin negotiations on the proposed changes and that pending the results of negotiation, neither party shall change conditions existing under this Contract.

Despite the fact that the union's request to add a Successor and Assigns Clause

occurred during effects bargaining, the procedure for negotiating changes to the CBA is plainly covered by Article 11.  Article 9 of the CBA states that all grievances, controversies and disputes arising under the CBA (including disputed interpretations of the Agreement) are subject to a mandatory and binding grievance and arbitration procedure.  Based upon the plain wording of the contract and the fact that no exclusions are set forth in either section, it is clear that any disputes arising from the negotiation of changes to the CBA under Article 11 are subject to the grievance and arbitration procedure set forth in Article 9.  Thus, the parties' dispute over the addition of a Successor and Assigns Clause should have been submitted to an arbitrator, rather than becoming the subject of a threatened work stoppage.

The union maintains that the instant dispute is not arbitrable because "the parties' CBA contains no provisions addressing the effects of a sale of [p]laintiff's business".  The union is correct in that certain effects of the sale on the terms and conditions of employment may not be addressed by the CBA, and therefore are not arbitrable.  However, the modification of the CBA to include a Successor and Assigns Clause, which is the only request the union has made during effects bargaining, is directly addressed by Article 11.  The union contends that if the Court accepts plaintiff's interpretation of the dispute, "a plain vanilla Termination Clause, brings any and all possible contract terms....under the auspices of a no-strike clause."  This is not the case.  The plain language of Article 11 not only

provides for termination of the CBA, but also for the procedure for negotiating

changes to the CBA.  Since the union seeks to change the contract to include a

Successor and Assigns Clause, and the CBA has yet to expire, the union is bound

by the confines of Article 11.  This requirement does not mean that other subjects

of effects bargaining, which may not be addressed in the unexpired CBA, would

be subject to the grievance and arbitration procedure and implied no-strike clause.

The Court's reading of Article 11 and Article 9 to encompass the instant

dispute is supported not only by the contract language, but also by the plethora of

case law instructing that when a collective bargaining agreement contains an

arbitration clause, courts should "indulge a presumption in favor of arbitrability."

*Local 1814, International Longshoreman's Ass'n v. New York Shipping Ass'n*, 965

F.2d 1224, 1233 (2d. Cir. 1992).  In *Local 1814*, the Second Circuit explained that

this presumption in favor of arbitrability "may only be overcome if 'it may be said

with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute'...[d]oubts should be resolved in

favor of coverage."  965 F.2d at 1233; *quoting United Steelworkers of America v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, at 582-83 (1960).  *See also Straus*

*v. Silvercup Bakers, Inc.*, 353 F.2d 555 (2d Cir. 1965) ("In the absence of any

express provision excluding a particular grievance from arbitration, we think only

the most forceful evidence of a purpose to exclude the claim from arbitration can

prevail."); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1

13

(1983) ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration") *Abraham & Straus, Inc. v. International Union of Operating Engineers,* 806 F. Supp. 366 (EDNY 1992) ("Courts have long recognized a presumption in favor of arbitrability where there is a broad arbitration clause in the collective bargaining agreement....[o]nly evidence of a purposeful exclusion of a particular issue from the agreement can overcome this presumption.")  Indeed, the Supreme Court has also held that even if a claim appears "frivolous" on the merits, a court should require arbitration.  *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 568 & n.6 (1960).

The union also takes the position that the dispute is not arbitrable because the arbitrator lacks the ability to "modify the terms of the agreement" or "enforce a non-existent successor and assigns clause".  The union again misconstrues the nature of the dispute.  The issue to be submitted to the arbitrator is not the enforcement of a non-existent clause in the parties' contract, but rather the parties' inability to agree upon a proposed modification of their contract pursuant to Article 11.  Furthermore, the union's contention that it will be dissatisfied with the results of arbitration because the arbitrator cannot unilaterally alter the agreement does not mean that the dispute is not subject to the contract's mandatory grievance and arbitration procedure.  *See The New York Times Co. v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 592 F. Supp. 1043 (SDNY 1984)

14

(granting a preliminary injunction under the *Boys Market* exception to the *Norris-LaGuardia* Act in spite of the union's claim that the dispute was not arbitrable since "the union cannot now be permitted to claim that [the dispute] is not arbitrable simply because it does not like the results of preliminary arbitration"); *Abraham & Stratus, Inc.*, 806 F. Supp. at 366 (requirements for a preliminary injunction under *Boys Market* were satisfied where there was a collective bargaining agreement with no-strike clause in effect, the threats to strike arose out of a staffing issue that the union was contractually bound to arbitrate, the employer had and would continue to suffer irreparable injury to its business and goodwill, and the union would "not suffer injury because the application for injunctive relief [would] merely enforce the bargain into which the union freely entered").

Local 264 argues that this case is on "all fours" with *Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO*, 428 U.S. 397 (1976) and *Industry City Associates v. Local 917*, 738 F. Supp. 50 (EDNY 1990), both of which involved a court's refusal to apply the *Boys Market* exception to the *Norris La-LaGuardia* Act's prohibition on injunctions in labor disputes.  However, both cases are inapposite to the instant matter.  In *Buffalo Forge*, the Supreme Court held that a district court cannot enjoin, pending arbitration, a union's sympathy strike as violative of a no-strike clause in a collective bargaining agreement.  *See* 428 U.S. at 397.  The Supreme Court reasoned that the *Boys Market* exception did not

apply where the only issue between the employer and the union was the

application of a no-strike clause:

> The District Court found, and it is not now disputed, that *the strike*
> *was not over any dispute between the Union and the employer that*
> *was even remotely subject to the arbitration provisions of the*
> *contract.*  The strike at issue was a sympathy strike in support of
> sister unions negotiating with the employer; neither its cause nor the
> issues underlying it was subject to the settlement procedures
> provided by the contracts between the employer and respondents.
> The strike had neither the purpose nor the effect of denying or
> evading an obligation to arbitrate or of depriving the employer of its
> bargain.

428 U.S. at 407-08 (emphasis added).  Here, unlike *Buffalo Forge*, it certainly

cannot be said that the strike is not over a dispute "even remotely subject to the

arbitration provisions of the [parties'] contract."  Indeed, the threatened strike at

issue here is directly related to the parties' dispute over modifying the contract,

which is covered by Article 11 of the CBA.  Since the object of Local 264's

threatened strike is related to compelling Will Poultry to concede an arbitrable

issue, i.e., changes to the agreement, and not merely over the application of a

no-strike clause itself, *Buffalo Forge* does not apply.

   *Industry City,* which is also distinguishable from this matter, involved a

dispute over a partial sale of the company's business and the reassignment of

certain workers.  *See* 738 F. Supp. 50 (EDNY 1990).[4]  The union involved

---

[4] *Industry City* was decided by the Eastern District of New York and therefore is
not binding precedent upon this Court.  Nevertheless, for the reasons discussed herein,
the Court finds the case to be distinguishable from the present dispute.

demanded that the employer provide advance notice of any future transfer of
bargaining unit work and require the transferee to assume the collective
bargaining agreement.  *Id*.  Negotiations reached an impasse, the employer
sought to submit the dispute to arbitration, and the union threatened to strike.  *Id*.
The Eastern District of New York refused to enjoin the union from striking.  *Id*.
The Court reasoned that "the effects of partial closing or sales is a subject of
mandatory bargaining under [Section 8(d) of the NLRA]...*assuming this issue is
not covered by an unexpired collective bargaining agreement*, the parties are
entitled to bargain to an impasse and resort to economic weapons at their
disposal."  *Id*. at 52 (emphasis added).

Significantly, in finding that the dispute over the effects of the partial closing
was not arbitrable, the *Industry City* Court specifically recognized that the issue
between the parties was not covered by their collective bargaining agreement.  In
contrast, and as discussed in detail above, Article 11 governs the dispute
between Will Poultry and Local 264.  In *Industry City*, there was no mention of a
clause similar to Article 11 addressing the negotiation of changes to the
agreement, nor was there any other indication by the court that the parties'
dispute was at all related to any provision in their collective bargaining
agreement.  That is not the situation we are faced with here.  The critical issue for
this Court to consider is not whether the dispute involves the effects of a closing
or a sale, but instead whether the underlying dispute is arbitrable.  The Court

17

finds that the dispute between Local 264 and Will Poultry over modification of the

CBA is covered by Article 9 and Article 11, and therefore the third requirement set

forth in *Boys Market* has been met.

### *The Traditional Requirements of Equity Are Satisfied Here.*

In *Salinger v. Colting*, the Second Circuit held that a plaintiff seeking a

preliminary injunction must show, in addition to likelihood of success on the

merits: "(1) that it has suffered irreparable injury; (2) that remedies at law, such as

monetary damages, are inadequate to compensate for that injury; (3) that,

considering the balance of hardships between plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction."  607 F.3d 68 (2d. Cir. 2010).  For the reasons just stated,

plaintiff has established a likelihood of success on the merits.  The Court finds

that the remaining conditions necessary for granting a preliminary injunction are

present here as well.

Plaintiff submitted an affidavit from Mr. Will, wherein he discusses the

significant time he spent building the company's reputation and goodwill.

Significantly, the APA specifically lists "goodwill" and "trade names" as assets that

the prospective buyer will be purchasing from Will Poultry.  In addition, after

receiving letters describing the threatened work stoppages, a number of

customers contacted Mr. Will and various sales representatives and expressed

their concern that any potential strike would interfere with the delivery of their

orders.  Specifically, three significant, longtime customers of Will Poultry

cancelled orders due to fears that the anticipated work stoppages would make it

impossible for Will Poultry to deliver their products on time.  For these reasons,

plaintiff contends that the strike threats already damaged and will continue to

damage Will Poultry's customer goodwill and business reputation.

The loss of business, business reputation and customer goodwill due to

work stoppages constitutes irreparable harm, and courts in this Circuit have

granted preliminary injunctions in situations similar to the matter at bar.   *See Otis*

*Elevator Co. v. Local 1, International Union of Elevator Constructors*, 684 F.

Supp. 80, 83 (SDNY 1988) (granting a *Boy Market* injunction after finding, *inter*

*alia*, that irreparable harm was established since work stoppages are likely to

damage a business irreparably by leading to a loss of goodwill and plaintiff had

demonstrated the substantial prospect that it may suffer a permanent loss of

business); *The New York Times Co. v. Newspaper and Mail Deliverers' Union of*

*New York and Vicinity*, 592 F. Supp. 1043, 1051 (SDNY 1984) (finding that the

court had jurisdiction to enjoin the strike and that the employer would suffer

irreparable harm if the union was permitted to engage in a work stoppage

"effectively shutting down the plants and preventing the [employer] from

publishing its papers especially since a shut down in publication is likely to lead to

a loss of goodwill"); *The Dannon Co. Inc. v. Whelan*, 555 F. Supp. 361, 366-67

(SDNY 1983) ("While the actual loss of sales each day during the pendency of

the walkout can adequately be redressed by monetary damages, the residual, and possibly permanent effect of [the employer's] failure to consistently supply its customers cannot.")

Moreover, Will Poultry is at significant risk of losing its potential buyer if the strike causes a loss of business reputation and goodwill.  These items are specifically enumerated in the APA and are considered important aspects or conditions of the sale.  While the union contends that the loss of the sale may be remedied by monetary damages in the form of the agreed upon purchase price, plaintiff avers that it has taken approximately three years to locate a buyer who intends to keep Will Poultry in Western New York and retain some of the company's current employees.  If this sale were to fall through, it is completely unknown whether Mr. Will will have any success finding a new buyer, and it appears to be unlikely that a new buyer would keep the company intact and in the Western New York area.  The potential loss of not only the sale, but also the prospect of having the company remain in Buffalo and retain a number of the current employees, also constitutes irreparable harm that cannot be remedied through a monetary damage award.

Finally, the balance of the equities fall on the side of Will Poultry.  If the union is permitted to strike, the company stands to lose not only customers, business reputation and goodwill, but also the sale it has worked for three years to accomplish.  If the sale is lost and Mr. Will is forced to sell the company to a

20

buyer who will relocate the company and/or its assets, all bargaining unit employees, as well as all other Will Poultry employees, will lose their jobs.  In contrast, the union may proceed to arbitration with respect to both the layoff grievance and its proposed modification of the CBA.  Local 264 and Will Poultry may also continue to engage in effects bargaining regarding the sale of the company.  The public interest would not be disserved by a permanent injunction. While the union does possess a fundamental right to strike in certain instances, the Supreme Court has specifically restricted that right in situations such as this one, where the dispute is covered by the mandatory grievance and arbitration procedure of the parties' contract.

The fact that the sale is scheduled to close in a short time, which may affect the union's ability to fully arbitrate their claims, does not change this Court's analysis.  The union had notice of the impending sale and layoffs since September 25, 2013, and could have proceeded to arbitration regarding the disputes over both the layoffs and the proposed contract modification by the end of October 2013.  The union also has had the ongoing ability to continue effects bargaining yet has chosen not to pursue further negotiations with the company. Thus, any frustration of the arbitration process was caused by the union's choice to proceed with a threatened strike rather than pursue the remedies available to it as set forth in the parties' contract.

## **CONCLUSION**

For the foregoing reasons, plaintiff's request for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure is granted.

It is hereby ordered that, until final termination of this action, defendant Local 264, its officers, agents, servants, members and employees, shall be enjoined and restrained from:

(1) calling, instigating, directing, encouraging or participating in any strike, work stoppage, slowdown or interruption of plaintiff Will Poultry's operations, by and among any of plaintiff's employees, over or in connection with the disputes or grievances related to employee layoffs and proposed modification of the collective bargaining agreement between Local 264 and Will Poultry to include a Successor and Assigns Clause;

(2) picketing in or about the vicinity of plaintiff Will Poultry's facility or its customers' facilities for the purpose or effect of calling, instigating, directing, encouraging or participating in any strike, work stoppage, slowdown or interruption of plaintiff Will Poultry's operations, by and among any of plaintiff's employees, over or in connection with the disputes or grievances related to employee layoffs and proposed modification of the collective bargaining agreement between Local 264 and Will Poultry to include a Successor and Assigns Clause.

It is also hereby ordered that plaintiff Will Poultry and defendant Local 264

shall submit the disputes between them regarding layoffs of employees and

proposed modification of the collective bargaining agreement to include a

Successor and Assigns Clause to arbitration in accordance with the applicable

provisions of their collective bargaining agreement.

The parties are directed to appear for a status conference before this Court

on January 22, 2014 at 9:00 a.m.

SO ORDERED.

_s/  Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: December 23, 2013